**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SANITYDESK INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 22-10527 |

**DECLARATION OF MARK ZOLLNER IN SUPPORT OF
DEBTOR'S PETITION AND FIRST DAY MOTIONS**

I, Mark Zollner, hereby declare under penalty of perjury:

1.  I am the Interim Chief Executive of SanityDesk Inc. (collectively, the "Debtor" or "SanityDesk").

2.  I have been employed with the Debtor since January 4, 2021. Prior to that date, I served the Debtor in a consulting capacity.

3.  I am a marketing specialist by background with more than 7 years' experience working in technology software startups. This includes roles heading up marketing teams (Synerise, LiveCall) as a startup advisor (Google for Startups Warsaw) and launching my own educational startup in 2013 (Skilldu).

4.  I submit this declaration ("Declaration") in support of the Debtor's chapter 11 bankruptcy petition and in support of the Debtor's "first day" motions and applications, described in further detail below (collectively, the "First Day Motions"). I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

---

[1] The last four digits of the Debtor's U.S. tax identification number are (8516). The Debtor's mailing address is 501 Congress Avenue Suite 150, Austin, TX 78701.
.

5. I, or those employees of the Debtor under my supervision, am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtor's management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtors' operations and financial affairs as well as the Debtors' books and records, or my opinions based upon my experience and knowledge. If called as a witness to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

6. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") commencing the above-captioned bankruptcy case (the "Cases"). It is anticipated that the Debtor will continue to manage its affairs and operate its business as a debtor and debtor-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

7. I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtor into this Case and permit the Debtor to achieve its bankruptcy objectives as further described below.

8. Part I of this Declaration describes the Debtor's business, capital structure, and the events leading to the filing of the Petition. Part II of this Declaration sets forth the First Day Motions[2] and the relevant facts in support of those motions.

## Background

**A. History of the Debtors and the Nature of the Debtor's Business Operations**

9. SanityDesk was founded in October 2019 by Samuel P.N. Cook and Tyron Dizon. Samuel Cook served as Chief Executive Officer until his resignation on 10th March 2022. Tyron Dizon continues to serve as Chief Product Officer.

10. SanityDesk is a technology startup that provides software to help small businesses grow online. SanityDesk provides both software as well as marketing services to small businesses.

11. SanityDesk software includes a range of marketing, sales and client support capabilities (e.g. marketing automation, email marketing, web page builder, sales CRM, support desk, etc). The software is sold as a subscription service but includes a free plan.

12. SanityDesk sells services to businesses which are fulfilled by third-party marketers (e.g. copywriters, strategists, paid ads specialists). These are mostly one-time payments but are sometimes sold using payment installments.

13. The primary users of SanityDesk are small business owners (size 1-10) selling high-value services. This predominantly includes consultants, coaches, advisors and agencies. SanityDesk has approximately 200 paying software customers today. About 2/3rds of customers are located in the United States. There are over 1,500 free accounts on SanityDesk.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

14. SanityDesk software was developed by its own team and represents its own intellectual property. The software was originally developed within a marketing agency, James Cook Media, Ltd. SanityDesk was created as a spinoff from James Cook Media agency.

15. From its founding, SanityDesk grew rapidly, reaching over $178,000 revenue in November 2021 of which over $67,000 was software subscriptions, over $50,000 was services provided by third party marketing specialists and agencies. The remaining revenue was predominantly from SanityDesk's own educational products.

16. SanityDesk's rapid growth was built on its ability to attract business owners who wanted to launch and grow their businesses online. This was especially through online marketing funnels. SanityDesk provided a convenient offer of software and services that addressed this.

17. SanityDesk full-time team grew to a maximum of 56 people. Currently, SanityDesk's headcount is 37. The team is located predominantly in Central and Eastern Europe in Poland and Ukraine. The main office was located in Kyiv until the outbreak of the Ukraine war in February 2022.

B. **Organizational Structure, Governance, and Current Management**

18. SanityDesk is a corporation organized and existing under the laws of Delaware with a principal place of business and its home office at 501 Congress Avenue Suite 150, Austin, TX 78701.

19. In October 2019 SanityDesk, Inc. was formed as a Delaware C corporation for the purpose of becoming a technology startup based on its own custom software.

20. SanityDesk's board of directors consists of the following members: Samuel Cook, Tyron Dizon, Anthony Orlando and Thomas Dorame.

### C.  Capital Structure

21.     As of May 31, 2022, SanityDesk had $747,470.92 in total assets comprised of $115,953.69 in current assets and $631,517.23 in long-term assets. As of May 31, 2022, SanityDesk had total liabilities of $3,782,643.19, consisting of current liabilities of $1,612,244.22 and long term liabilities of $2,170,398.97.

22.     For the year to date May 31, 2022, SanityDesk had revenue of $57,728.83 and a net loss of ($112,488.17).  For the year 2021, SanityDesk had revenue of $1,354,277 and a net loss of ($1,863,890).

### D.  Circumstances Leading to the Chapter 11 Filing

23.     A number of circumstances led to the filing of this Chapter 11 proceeding. Historically, the Debtor relied on paid ds through one marketing channel - Facebook.  In April 2021, iOS 14.5 was introduced and it limited the data that Facebook could use and the cost of advertising increased.  At the same time, the former Chief Executive Officer increased advertising spending despite the fact that the Debtor had historically experienced less advertising efficiency with increased advertising spending.

24.     Additionally, the Debtor was attracting customers who paid month to month and could cancel at anytime.  These customers didn't stay as long as expected and, as a result, the Debtor's realized revenues did not meet its projections.

25.     Finally, the Debtor's operations have been adversely impacted by the war in Ukraine which is where the Debtor's customer support team is located.

26.     In the period July 2021 to February 2022, the Debtor's average operating expenses were about $268,000 per month.  After restructuring, operating expenses have been reduced to under $160,000.  However, as a technology start-up with costs of building and supporting its

technology product, the Debtor has not been able to generate sufficient revenue to meet its expenditures. Moreover, the Debtor has been unable to raise additional funds from investors. As a result, the Debtor is currently experiencing a liquidity crisis.

27.     The Debtor intends to use the breathing space afforded by the Chapter 11 to conduct a sale process and preserve the going concern value of its business for the benefit of its creditors, team members and customers.

### First Day Motions

28.     The Debtor filed the First Day Motions contemporaneously herewith to ensure that the Debtor's business continues to function during the Case. For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtor's business operations, (ii) operate with minimal disruption during the pendency of the Case, (iii) maintain the Debtor's value as a going concern, and (iv) facilitate the efficient and economical administration of the Case. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[3]

**A. DIP Motion**

29.     Pursuant to the DIP Motion, the Debtor requests entry of interim and final orders authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $164,000 substantially on the terms set forth in the Debtor In Possession Credit And Security Agreement between the Debtor and the lenders identified therein, (b) modifying the automatic stay to the extent applicable and (c) granting related relief.

---

[3] Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

30. The Debtor proposes to enter into the DIP Financing in order to fund the administration of this Case and its reorganization, solely in accordance with the DIP Budget. The DIP Financing will provide the Debtor with up to $164,000 to fund necessary operations of the Debtor and to administer this Case through a successful sale or reorganization of the Debtor's assets and liabilities. Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.

31. I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to manage its business operations during the pendency of this Case without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

B. **Cash Management Motion**

32. In the ordinary course of its business, Debtor maintains a cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtor's cash assets. The Cash Management System allows the Debtor to efficiently identify its cash requirements and transfer cash as needed to respond to these requirements. The Cash Management System is important to the efficient execution and achievement of the Debtor's business objectives, and, ultimately, to maximizing the value of the Debtor's estate.

33. The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage their cash in a cost-effective, efficient manner. The Cash Management Motion describes the Cash Management System in greater detail.

34. The Debtor maintains eight (8) separate bank accounts: Account Nos. 9801882701, Account No 9800665317, Account No. 981682918, Account No.980131908, and Account No.

9801832878 with Evolve; Account Nos. 3303245277 and 3303245262 with SVB; and Account No: 578576537 with Chase.

35. As of the Petition Date, the Debtor has the following amounts in the Evolve Accounts, the SVB Accounts and the Chase Account.

| Bank | Account Number | Use of Account |
|---|---|---|
| Evolve Bank & Trust | 9801882701 | Operating account |
| Evolve Bank & Trust | 9800665317 | Checking |
| Evolve Bank & Trust | 9801682918 | Checking |
| Evolve Bank & Trust | 9801832878 | Checking |
| SVB | 3303245277 | Checking |
| SVB | 3303245262 | Operating Account |
| Chase | 578576537 | Checking |

36. The Debtor follows specific internal cash management procedures (the "**Procedures**") associated with its disbursements. Some vendors are pre-authorized.

37. The Debtor follows specific internal cash management procedures (the "Procedures") associated with its disbursements. Requests for disbursements are checked with relevant team members who are familiar with the transaction who then confirm it with the finance department. Depending on the bank, specific procedures are followed:

38. For wire transfers from Evolve Bank, the finance department loads the transfer request which is then approved by the Chief Executive Officer. Before March 10, 2022, this was the former Chief Executive Officer, Samuel Cook. After March 10, 2022, this has been the Interim Chief Executive Officer, Mark Zollner.

39. For wire transfers from Chase Bank, the finance department loads the transfer getting approval from the Interim Chief Executive Officer. After this, Samuel Cook approves the transfer. Due to bugs in Chase banking software, a change in account signatories to the Interim

8

Chief Executive Officer has not been possible. Thus, Samuel Cook who still holds a Director position on the Board of Directors remains the authorized person on behalf of the Debtor.

40. For refund requests, an operations manager or the finance manager can authorize it. Refunds are based on internal policy connected to the specific products sold.

41. For disbursements that use only cards, for example using Wise to pay a minority of team members, the finance team disburses money automatically based on pre-agreed remuneration and agreement.

42. For disbursements using Paypal, the finance team disburses money automatically that are pre-authorized or based on pre-existing agreements.

43. In the ordinary course of business, the Debtor's banks debit the Accounts for fees and expenses related to wire transfers and other fees, costs, and expenses that are standard for a typical corporate bank account (collectively, the "Bank Fees"). The Bank Fees are either debited directly from the Debtor's bank account or paid in connection with wire transfers.

44. The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtor and its estate, including, *inter alia*, the ability to: (a) control and secure corporate funds, (b) ensure the maximum availability of funds, when necessary, (c) reduce costs and administrative expenses associated with the movement of funds, and (d) obtain timely and accurate account balance information.

45. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to manage its business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

C.  **Independent Contractor Obligations Motion**

46.  Debtor has no employees; rather, all of the Debtor's team members that perform its software design, marketing and administrative functions are independent contractors. In the Independent Contractor Obligations Motion, the Debtor requests that the Court enter an order authorizing, but not directing, the Debtors, in their sole discretion: (a) to pay to the Independent Contractors all accrued prepetition wages, salaries, and other amounts described more fully below (collectively, the "Independent Contractor Obligations").

47.  The Debtor also requests an order authorizing the Banks to honor and process checks, and electronic transfer requests related to the foregoing.

48.  The Debtor's workforce comprises of 37 Independent Contractors whom the Debtor compensate in the ordinary course of its business.

49.  The Debtor's ability to maximize the value of the estate for all stakeholders depends on the expertise and continued enthusiasm and service of the Debtor's Independent Contractors. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the Independent Contractors may be adversely affected. If the Debtor fails to pay the Independent Contractors' wages, the Independent Contractors will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses. This outcome would have a negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby causing immediate and irreparable harm to the Debtor and its estate.

50.  The total amount owed to the Independent Contractors as of the Petition Date is approximately $120,000.

51. I believe that the relief requested in the Independent Contractor Obligations Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to manage their business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the Independent Contractor Obligations Motion should be approved.

### D. Critical Vendor Motion

52. The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay the prepetition claims of certain vendors that are critical to the Debtor's operations, as more fully described herein and in the Critical Vendor Motion (the "Critical Vendor Claims") up to $45,000 on an interim and final basis.

53. The Debtor has a number of key relationships with vendors who provide essential goods and/or services to the Debtor in the ordinary course of business (the "Critical Vendors"). The Debtor believes that if it cannot continue the relationships with the current Critical Vendors, it may be impossible to continue doing business.

54. In any event the amount of capital required to obtain comparable services (if at all possible after a default under an agreement with a Critical Vendor) would be much greater than the combined total of making payments on the past due amounts to the Critical Vendors and the likely payments required on account of post-petition goods and services.

55. The Debtor believes that it must continue to receive the services provided by the Critical Vendors in order to achieve a successful reorganization. In some cases, the Debtor believes that absent payment of prepetition amounts due, the Critical Vendors may refuse to deliver any services on an ongoing basis even if the Debtor can pay post-petition amounts due.

56. Ultimately, the Debtor believes that its ability to continue operations at the efficient and high-quality levels needed to reorganize successfully will largely depend on the continued participation of the Critical Vendors. The Debtor, along with its restructuring advisors, have performed an analysis of the payments to Critical Vendors necessary to avoid potentially significant disruptions to the Debtor's business operations. The Debtor believes that a fund of $45,000 in the aggregate should provide the flexibility necessary for the Debtor to receive the vital services it requires to continue being successful as a reorganized entity.

I declare under penalty of perjury that, to the best of my knowledge after reasonable inquiry, the foregoing is true and correct.

Dated: June 10, 2022

*Mark Zollner* (DocuSigned)
C1C3AE6C7B024D8...

Mark Zollner, Interim Chief Executive Officer of SanityDesk, Inc.